NOT DESIGNATED FOR PUBLICATION

No. 129,777

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of G.L., a Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; MICHAEL HOELSCHER, judge. Submitted without oral argument. Opinion filed July 2, 2026. Affirmed.

*Jeffrey Leiker*, of Leiker Law Office, P.A., of Overland Park, for appellant.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before SCHROEDER, P.J., GARDNER and CLINE, JJ.

CLINE, J.: Mother appeals the termination of her parental rights to G.L. after she relinquished those rights, claiming her relinquishment was invalid and the termination was not supported by clear and convincing evidence nor was it in G.L.'s best interests. On review, we find Mother has failed to show her relinquishment was not done freely, knowingly, and voluntarily and in accordance with K.S.A. 38-2268. It is therefore valid. And because Mother voluntarily terminated her parental rights through relinquishment, there was no need for the district court to make evidentiary findings to support the termination. See *In re P.R.*, 312 Kan. 767, 784, 480 P.3d 778 (2021) ("Relinquishment is a statutory method of ending the parent/child relationship without requiring the State to prove a parent's unfitness."). For these reasons, we affirm the district court's decision terminating Mother's parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

G.L. was born in 2024. Mother presented with late prenatal care and a history of heroin use but reported that she had been clean since March 2023. G.L. was admitted to the NICU with respiratory distress, looser stools, and jittery movements—potential signs of withdrawal. As a result, a report was sent to the Kansas Department for Children and Families (DCF) for further investigation, and G.L.'s umbilical cord was sent for drug testing.

While G.L. was in the hospital, the doctors noted that Mother was constantly in and out, only seeing G.L. for 45-minute periods before leaving again—avoiding diaper changes and feedings. Mother gave various excuses, including that she had to go do a walkthrough with DCF; however, the doctors were in contact with DCF staff who confirmed that the walkthrough was not scheduled for the times Mother was claiming. Mother also would not comply with safety practices outlined by the nurses regarding feedings and safe sleep.

G.L.'s withdrawals worsened, and within a week of birth, she needed to be held 24 hours a day. Her cord results came back positive for methamphetamine, amphetamine, benzodiazepines, and buprenorphine. G.L. "had more than 100 ng/g of methamphetamine in her system" which the case manager described as "'very very high.'" They placed G.L. on a morphine drip every four hours to treat the withdrawals.

A child in need of care petition was filed two weeks after G.L.'s birth. The next day, a temporary custody hearing was held, and Mother waived her right to an evidentiary hearing. The district court ordered that G.L. be placed in out-of-home care, and DCF retained discretion over visitation. One-hour visitations were permitted weekly.

Two months later, after testing positive for methamphetamine, Mother entered a no contest statement to the petition, and orders of adjudication and disposition were entered adopting the proposed permanency plan as the district court's order.

In May 2024, Mother's hair follicle test came back positive for methamphetamine. Mother failed to submit urinalysis samples in March, May, June, and July; those were each considered a positive result. In August, Mother submitted a urine sample and mouth swab that both tested positive for methamphetamine. In September, Mother's mouth swab came back positive for methamphetamine. In October, Mother submitted a urine sample that tested positive for heroin and a hair follicle that tested positive for methamphetamine. In January 2025, Mother submitted a hair follicle that tested positive for amphetamine and methamphetamine. In February 2025, Mother's mouth swab and urine sample both tested positive for amphetamine and methamphetamine. Mother did not complete drug testing on 12 different occasions between March 2024 and February 2025 as requested—which were considered positive for all substances.

In February 2025, the district court held another adjudication and disposition hearing and determined that reintegration was no longer viable. The State filed a motion to terminate parental rights within 30 days.

At the beginning of the evidentiary hearing on the motion to terminate, Mother's attorney requested a continuance, stating that Mother believed additional information would be available if the continuance were granted. The State and the guardian ad litem opposed the continuance based on Mother's continued positive drug tests and the time the case had been pending. The guardian ad litem noted that Mother's last positive drug test was about a month before the hearing date, and since that time, Mother refused to complete the drug tests requested by the agency. Additionally, the district court had ordered a urinalysis test to be completed at the courthouse that morning, but Mother refused to take it.

The district court denied Mother's request for a continuance. Mother then stated, "I don't even want to say anything anymore because it's obviously not going to make a difference, and I'll just relinquish." The court asked whether the relinquishment paper was available and explained to Mother that she

> "seem[ed] like a delightful person, and [the court was] not trying to be difficult with [her]. What federal guidelines say, generally, is around the 12-month mark, if we're not making significant progress towards reintegration, then we start looking at other options. Previously, [the court] made the finding that reintegration was no longer a viable goal. As [the State] pointed out, we started this case back on [month and date omitted] of 2024, which means we're about 18 months into this process.
>
> "And [the court] appreciate[s that] this is a really difficult struggle. . . .
> ". . . But the rules have to be different down here in child in need of care court because the problem is we've got a child that's sitting in foster care indefinitely, and they deserve better than this."

Mother and her attorney were then allowed to take a recess and discuss her decision.

Upon return, Mother's attorney confirmed with the district court that he had reviewed the statutorily mandated relinquishment document before the hearing, read the document to Mother, and provided Mother with a copy so she could follow along during the hearing. The court then stated on the record that it witnessed the signatures placed on the document in open court. The court concluded that termination of Mother's parental rights was in G.L.'s best interests for her physical, mental, and emotional health and ordered Mother's rights terminated.

Mother contends the district court erred by finding that she knowingly and voluntarily relinquished her parental rights. She claims her relinquishment was "reactive and occurred in the context of perceived futility," so it should not stand.

The voluntariness of an individual's relinquishment of parental rights is a mixed question of fact and law. When reviewing whether a parent voluntarily relinquished his or her rights, an appellate court applies a two-step standard of review. First, we review the district court's factual findings to determine whether they were supported by substantial competent evidence. Next, we exercise unlimited review over the district court's conclusions of law. *In re P.R.*, 312 Kan. at 781.

A relinquishment of parental rights is "'a complete and final divestment of all legal rights, privileges, duties, and obligations of the parent and child with respect to each other.'" *State ex rel. Secretary of SRS v. Bohrer*, 286 Kan. 898, 914, 189 P.3d 1157 (2008) (quoting *State ex rel. Secretary of SRS v. Clear*, 248 Kan. 109, 115, 804 P.2d 961 [1991]). A relinquishment of parental rights must be knowing, free, and voluntary. *In re P.R.*, 312 Kan. at 781. When the district court determines the proposed relinquishment is voluntary and the parent has been fully advised of all rights and consequences, the court has the power to approve the relinquishment. *In re A.W.*, 241 Kan. 810, 816, 740 P.2d 82 (1987).

The provisions of K.S.A. 38-2268(a)-(b) govern the voluntary relinquishment of parental rights. K.S.A. 38-2268 provides several procedural safeguards to ensure an individual's relinquishment of parental rights is voluntary. For example, the relinquishment must be in writing, it must substantially conform to the form provided by the Kansas Judicial Council, it must be acknowledged before a judge or notary, and if

acknowledged before a judge, the judge must advise the parent of the consequences of relinquishing parental rights. K.S.A. 38-2268(b)(2), (b)(3).

"A voluntary act is one 'done by design or intention.'" *In re C.D.A.*, No. 111,674, 2014 WL 5801348, at *4 (Kan. App. 2014) (unpublished opinion) (quoting *In re C.P.*, No. 109,359, 2014 WL 349616, at *5 [Kan. App. 2014] [unpublished opinion]). The determination of whether consent to relinquish parental rights was freely and voluntarily given depends on the facts and the circumstances of each case. *In re Adoption of X.J.A.*, 284 Kan. 853, 876, 166 P.3d 396 (2007). A properly signed relinquishment "serves as prima facie proof that the written consent was freely and voluntarily given, and the consenting parent must show fraud, duress, undue influence, mistake, or lack of understanding to rebut the presumption." *In re D.R.W.*, No. 113,629, 2015 WL 8591600, at *7 (Kan. App. 2015) (unpublished opinion).

Here, substantial competent evidence supports the district court's finding that Mother freely and voluntarily relinquished her parental rights. The district court confirmed that Mother understood the gravity of her decision, and she confirmed that she understood she was relinquishing her child to DCF and the decision would be permanent. The district court also confirmed that Mother understood she had the right to have a trial on the matter and that the State would have to meet its burden instead of her relinquishing her rights. Mother stated that she was not coerced, was satisfied with her counsel, and did not want to have a trial on the issue.

Mother asserts that the record does not demonstrate sufficient advisement of rights and consequences before relinquishment "because the District Court abruptly shifted to a relinquishment proceeding immediately after Mother's attempt to present evidence of her 'substantial gains' was cut off by the denial of her continuance." But the record does not support that assertion. The district court denied the continuance but did not deny Mother's opportunity to present the evidence of her "substantial gains" at the evidentiary hearing

6

that day. In fact, the court informed Mother repeatedly that she was entitled to an evidentiary hearing and that she could "say anything [she] would like to, and [the court would be] happy to listen."

Our Supreme Court has held that there is "no merit in the contention that judicial proceedings, per se, subject a parent to duress which might invalidate a voluntary relinquishment." *In re A.W.*, 241 Kan. at 816. Therefore, Mother's argument that the pivot to the evidentiary hearing was an improper stressor is unsupported and fails to rebut the presumption that her relinquishment was not freely and voluntarily given.

While Mother's initial mention of relinquishment may have been reactive, she then stated, "Never mind," and asked to speak to her attorney. The district court then took a recess to allow Mother and her attorney to speak about her options and rights.

There is also ample evidence to support the fact that Mother was repeatedly and emphatically informed of her rights and the consequences of her decision. Following the 10-minute recess, Mother's attorney told the district court that he had advised Mother of her rights to a trial, but Mother wished to relinquish her rights. The court instructed Mother to interrupt and ask any questions as it went through the necessary information to confirm that she wanted to relinquish her rights. The following excerpt reflects the information gathered:

> "THE COURT: . . . "Ma'am I think that you've made the decision to relinquish your parental rights to the child here this morning. Is that, in fact, your decision, ma'am?
> "[MOTHER]: Yes.
> "THE COURT: [Mother], within the last 24 hours, have you consumed alcohol, medication, or other drugs to the extent that your ability to understand your rights in this case has been affected?
> "[MOTHER]: No.

7

"THE COURT: Is there any mental, emotional, or physical reason that is preventing you from understanding what's happening here in the courtroom today, ma'am?

"[MOTHER]: No.

"THE COURT: Ma'am, your choice to relinquish your parental rights to the child here today will result in the Court terminating your parental rights.

"A voluntary relinquishment of parental rights will result in a complete and final divestment of all legal rights, privileges, duties, and obligations of the parent. The parent whose rights have been terminated is relieved of all duties and obligations to the child. In each case, the loss of parental rights is complete. It includes the termination of the right to inherit from or through the child. You will no longer have a right to be notified of any future hearing in this case, including hearings that deal with the adoption of the child.

"Additionally, you will not have the right to consent or refuse consent to the adoption of the child, and you will have no voice in that process. Although you will no longer be able to inherit from or through the child, the child may still be able to inherit from or through you.

"The termination of parental rights is an extremely serious matter and may be accomplished only in a manner which ensures maximum protection of all of your rights, as well as the rights of the child.

"Ma'am, do you understand that you have a right to have an evidentiary hearing regarding whether your parental rights are terminated?

"[MOTHER]: Yes.

"THE COURT: At that hearing, the petitioner would have the burden to prove by clear and convincing evidence that you are unfit by reason of conduct or condition which renders you unable to care properly for the child and the conduct or condition is unlikely to change in the foreseeable future. Additionally, the petitioner would have to prove that it is in the child's best interest that your parental rights be terminated.

"Do you understand the purpose of the evidentiary hearing, [Mother]?

"[MOTHER]: Yes.

"THE COURT: Have you had sufficient time to discuss your rights with your attorney, Mr. Mitchell?

"[MOTHER]: Yes.

"THE COURT: Are you satisfied with the services of Mr. Mitchell?

"[MOTHER]: Yes.

"THE COURT: Are you satisfied with the way that I have treated you, ma'am?

"[MOTHER]: Yes.

"THE COURT: Is anyone coercing you to relinquish your parental rights here today?

"[MOTHER]: No.

"THE COURT: Have any promises been made to you regarding the ultimate placement of this child?

"[MOTHER]: No.

"THE COURT: Is it your choice to waive your right to an evidentiary hearing on the issue of termination of your parental rights?

"[MOTHER]: Yes.

"THE COURT: I find that you have knowingly, intelligently, and voluntarily waived your right to an evidentiary hearing on the issue of termination of your parental rights.

"Ma'am, is it your choice to relinquish your parental rights at this time?

"[MOTHER]: Yeah, [indiscernible]."

Before the court ended the hearing, Mother asked, "How is it in [G.L.]'s best interest now that she has a bond with me to completely remove her out of my life, like so she doesn't get to see me?" Then the following interaction occurred:

"THE COURT: Sure. I'll give you the very best answer that I know how to give. I don't think that I have ever conducted a termination evidentiary hearing where you don't wrestle with that.

"But at this point in time, [G.L.] came into custody at the time that she was a newborn. She has spent 18 months of her life in custody, waiting for a fit parent where she could be reintegrated with that fit parent, and we're no closer to that than we were the day she was born.

"And at some point in time—a child cannot sit in foster care indefinitely. She deserves better than this.

"[MOTHER]: I agree. I totally agree that she doesn't deserve to be even where she is now. It's my fault. You know, it was my choices. I don't know. I guess I—she has to live with this the rest of her life too.

9

"THE COURT: I agree. Ma'am, here's the—what I have—the legal standard that I have to apply is first the State has to prove that you're unfit by reason of conduct or condition which renders you unable to care properly for this child and that that is unlikely to change in the foreseeable future. And that's part of what we're talking about here today, is that 18 months later, we're no closer.

"[MOTHER]: I was working to get there, but then when the entities changed, they sent me straight back to the facility for an hour. They didn't even know me yet. They didn't know my case even yet.

"THE COURT: Ma'am, is it still your choice to relinquish your—

"[MOTHER]: Yes.

"THE COURT:—parental rights here today?"

Mother's attorney confirmed with the court that he had reviewed the statutorily mandated relinquishment document before the hearing, read the document to Mother, and provided Mother with a copy so she could follow along during the hearing. The court then stated on the record that it witnessed the signatures placed on the document in open court. The court concluded that termination of Mother's parental rights was in G.L.'s best interests for her physical, mental, and emotional health—and ordered Mother's rights terminated.

The form Mother signed stated at the top: "This is an important legal document and by signing it you are permanently giving up all custody and other parental rights to the child named herein." The form included information—which the court also discussed with her—informing her that by signing it, the Secretary of DCF would have the "full power and all the rights of a birth parent or legal guardian over the child, including the power to place the child for adoption and give consent thereto."

The form added that Mother understood that "by signing this relinquishment [she did], permanently give up all custody and other parental rights [she had] to such a child." And just above her signature, the form contained the statement that she read and

10

understood the above statements and she was "signing it as [her] free and voluntary act." Moreover, Mother understood the consequences of relinquishment as she had relinquished her rights to her older child two and a half years before relinquishing her rights to G.L.

In *In re J.D.P.*, No. 117,638, 2018 WL 4373906 (Kan. App. 2018) (unpublished opinion), the mother also suffered from a methamphetamine addiction and decided to relinquish her rights. During the relinquishment, however, the mother there repeatedly said she was being forced by "'the Mitchell County Courts'" and was not making an informed decision. 2018 WL 4373906, at *3. The court stated that she had the right to proceed to trial instead if she felt forced, and she stated that she did not want to go to trial and wanted to proceed with the relinquishment. After thoroughly advising the mother of her rights, despite her suggestions that there was coercion or duress, the district court concluded that the relinquishment was knowing and voluntary because the options were go to trial or relinquish and she vehemently rejected trial. 2018 WL 4373906, at *4.

This court affirmed, noting that the mother signed the relinquishment of rights forms, the mere occurrence of judicial proceedings cannot subject a parent to distress sufficient to invalidate voluntary relinquishment, and her discontent was instead with the difficult options before her. 2018 WL 4373906, at *4. While difficult,

> "the emotions, tensions, and pressures of a termination-of-parental-rights proceeding are insufficient to void the relinquishment of a parent's rights—even when the appealing parties argued that they had been pressured to relinquish their rights or when they had been advised that they were unlikely to succeed at trial." *In re C.D.A.*, 2014 WL 5801348, at *9.

Thus, like *In re J.D.P.*, Mother knowingly and voluntarily relinquished her parental rights after being thoroughly informed of her rights and the consequences of her decision— despite there being emotional turmoil during the hearing.

11

Mother also argues that the State failed to demonstrate that termination was warranted by clear and convincing evidence and that she was entitled to a distinct evidence-based best interests determination.

However, because Mother's relinquishment was knowingly and voluntarily made, she waived any further evidentiary hearing requirements. In *In re P.R.*, the mother made a similar argument after voluntarily relinquishing her parental rights but framed it as a denial of due process. This court found that the "issue of the termination of Mother's parental rights was not resolved by the district court weighing conflicting evidence of her parental fitness" but rather "solely on her voluntary relinquishment of her parental rights." *In re P.R.*, No. 119,745, 2019 WL 2306763, at *6 (Kan. App. 2019) (unpublished opinion), *aff'd* 312 Kan. 767. As such, she was not entitled to any further due process as she had waived the need for an evidentiary hearing in which the State would have had to prove her unfitness.

Our Supreme Court has likened a voluntarily relinquishment in a termination of parental rights case to that of a plea in a criminal case, stating:

> "[Mother] was no more entitled to procedural due process following her relinquishment than a criminal defendant is entitled to a jury trial after entering a successful plea of guilty or nolo contendere. It is an either/or proposition, not both. Relinquishment is a statutory method of ending the parent/child relationship without requiring the State to prove a parent's unfitness. [Mother] terminated her own parental rights voluntarily, and in doing so eliminated the necessity for a termination hearing or any further hearing as to her parental rights." *In re P.R.*, 312 Kan. at 784-85.

Furthermore, a best interests finding under K.S.A. 38-2269(g)(1) is only required after a court makes a finding of unfitness. Because a finding of unfitness was unnecessary, evidence to support a finding that termination was in the best interests of G.L. is also not required. Thus, the State was not required to present any witnesses or

evidence to support the termination, nor was it required to present evidence of G.L.'s best interests because Mother had knowingly and voluntarily relinquished her parental rights.

Affirmed.